Filed 8/13/25  P. v. Lim CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FOURTH APPELLATE DISTRICT

### DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G063253 |
| v. | (Super. Ct. No. 00HF0111) |
| CHENG LIM IV, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from an order of the Superior Court of Orange County, Lance P. Jensen, Judge. Affirmed.

Jill M. Klein, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, James M. Toohey and Arlene A. Sevidal, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

In January 2000, defendant Cheng Lim IV (Lim) was involved in a Los Angeles area robbery with four other people. The victim of the robbery was college student Eric Liu (Eric). Lim helped to bind Eric with duct tape and place him in the trunk of his own car. Later that day, firefighters found Eric's dead body in the trunk of his burning car in Orange County.

The People charged Lim and the others with murder. At that time, the felony-murder rule provided that all participants in a robbery may be liable for murder if a killing occurs in perpetration of a robbery; however, at Lim's 2002 trial, the jury could not reach a unanimous verdict. Lim later pleaded guilty to murder, with a negotiated 25-year-to-life sentence.

In 2021, Lim filed a petition for resentencing. (Pen. Code, § 1170.95.)[1] The trial court conducted an evidentiary hearing. After reviewing the 2002 trial transcripts, the court denied Lim's petition. The court found that Lim was a major participant in the underlying felony who acted with reckless indifference to human life (the current felony-murder rule).

On appeal, Lim claims there is insufficient evidence to support the trial court's ruling. Alternatively, he claims there is insufficient evidence to support a theory that he was a direct aider and abettor. After reviewing the underlying record, we find substantial evidence supports the trial court's factual determination under the current felony-murder rule; therefore, we need not address Lim's alternative claim.

Thus, we affirm the trial court's order, which was a denial of Lim's section 1172.6 petition.

---

[1] Assembly Bill No. 200 (Reg. Sess. 2021-2022) later renumbered section 1170.95 as section 1172.6. (See Stats. 2022, ch. 58, § 10.) For clarity, we will generally refer to section 1172.6 throughout. Further undesignated statutory references are to the Penal Code.

# I.

## FACTS AND PROCEDURAL BACKGROUND

In the months prior to his death, Eric was a college student who worked part time as a math tutor. Tien Shiang Mo (Helen) was one of Eric's students, who would often come to his home, where he lived with his sister. Eric's sister suspected Helen had taken money and jewelry from the home. Eric also came to suspect that Helen had used his credit card.

In early January of 2000, Eric confronted Helen about the thefts. Helen admitted that she had stolen jewelry and used Eric's credit card. Helen claimed that she had pawned the jewelry, but she said she would try to get it back. Eric told Helen that the jewelry was valued at $10,000, and that if she did not either reimburse him, or return the jewelry by January 24, 2000, then he would contact the police.

Helen was unable to retrieve all of the jewelry. She was aware that if Eric called the police, she could face a 25-year-to-life sentence because she had two prior strike convictions. Helen discussed her predicament with her boyfriend Sonny Wong (Sonny). About a week prior to Eric's deadline, Helen, Sonny, Souriyo Banthakounh (Yo), Li Da Liang (Liang), and Lim met at a restaurant.[2] Helen and Sonny said there was somebody very rich that they were going to rob.

*The Robbery of Eric at Helen's Los Angeles Area Home*

On January 24, 2000, starting at 2:52 a.m., and throughout the

---

[2] Liang testified at Lim's trial as part of a plea agreement. Liang's testimony provided most of the direct evidence regarding Eric's robbery and eventual death.

3

day, there were several phone calls involving Sonny, Helen, and Lim.[3] At 8:43 a.m., Helen purchased $2 worth of gasoline from a gas station. At some point that morning, Sonny drove to Liang's home and picked him up in his car. Yo and Lim were also in the car. Sonny then drove to Helen's family's home in Monterey Park. Sonny told the others "that later on somebody would come and that we should catch him and take his money."

After arriving at Helen's house, Liang noticed that her parents were not home. Liang also saw a plastic bag that contained two large cleaver-type knifes, and some duct tape. When Liang asked Sonny what the knives were for, "he responded that if it was necessary he could use" the knives. Sonny told Lim, Yo, and Lang that "later on someone" would be "coming."

After they had waited for a long time, and at Sonny's direction, Helen called Eric and asked him "to hurry up and come over." The entire group was in the living room when Helen made the phone call. Sonny asked the group "to hide and when the person came in we should tie him up" with the duct tape "and take the money." Sonny and Liang hid near the stairs, and Lim and Yo hid in the restroom.

Minutes after Helen made the phone call, Eric arrived at her home. After Helen let Eric inside, the four men immediately rushed out from their positions and jumped him. Sonny held a knife to Eric's head, as the rest of the group used the duct tape to tie him up. Liang covered Eric's eyes and mouth with the tape, as Yo and Lim tied his hands and feet. Eric was now laying on the living room floor, with his hands bound in front of him, and his legs similarly bound with duct tape.

---

[3] The phone records involved Helen's cell phone, Helen's home phone, Sonny's cell phone, Lim's pager, Lim's home phone, and a payphone located at a gas station near Helen's home.

4

Sonny took cash from Eric's wallet (about $15) and a credit card. Sonny took the duct tape off of Eric's mouth and asked for his PIN number. After Eric gave Sonny the number, Sonny immediately put the tape back on Eric's mouth. Sonny gave the cash from Eric's wallet to Liang to hold, and then Sonny left the home. The group remembered that when Eric came into the home, he had a phone. They searched Eric to look for his phone because they were afraid that he may make a call for help, but they could not find it.

Sonny returned after about a half an hour. Eric had remained bound and gagged the entire time. Sonny was angry because Eric had apparently given him a fake PIN number. The group asked Sonny whether he had Eric's phone, and "Sonny was very angry he couldn't find the phone, and then he saw that [Eric] had the phone in his hand." Sonny took Eric's phone, which Eric had apparently attempted to use to make a call (some buttons had been pushed).

Sonny yelled at Eric to give him the real numbers to the bank account. Sonny held a knife to Eric's head as he threatened him. Liang saw Sonny cut Eric's forehead. Sonny said, "'Sh*t, blood came out.'" At this time, Lim came up the stairs and into the living room, and Sonny then asked Lim to help him carry Eric downstairs. Eric was still bleeding from his head, and his arms and legs were still bound with duct tape, as Sonny and Lim carried Eric's body to the trunk of Eric's car, which was now parked in the garage.

Because of Eric's knife wound, there was blood on the living room carpet and the stairs leading to the garage, so Sonny and Helen left to go get a carpet cleaning machine. They were gone about 20 to 30 minutes, while Eric remained bound and gagged in the open trunk of his car. Liang noticed that Eric was still breathing. Liang, Yo, and Lim remained at the house and smoked cigarettes.

Sonny and Helen returned with a carpet cleaning machine and the group worked at cleaning the blood for about a half an hour. After the carpet had been cleaned, Helen asked the group to leave because there was a possibility of her parents returning home. Sonny put Eric's wallet, the duct tape, and the contents of the plastic bag into Eric's trunk. Sonny asked Lim, Yo, and Liang to leave in his car and come back in a little while. Sonny left Helen's home in Eric's car with him bound in the trunk; Lim drove Sonny's car with Yo and Liang.

*The Culmination of the Crimes in Orange County*

Lim drove to a San Gabriel donut shop that was about 10 minutes away from Helen's home. Using almost all of the money that had been taken from Eric, the group (Lim, Liang, and Yo) got something to eat, along with drinks and cigarettes. After about 20 minutes, Lim drove back to Helen's house. The group walked up the stairs, but they could see and hear that Helen's parents were home, so they left. When they got back into the car, they were going to go back to the donut shop, but then Sonny called Lim and told him to go somewhere else to meet up with him. [4]

Lim drove about 10 minutes away to an area between a gas station and a motel. After they stopped, Sonny came to the car and told Lim to follow him. Sonny returned to Eric's car and Lim followed Sonny on the freeway for about an hour. The two cars eventually got off the freeway, and stopped on a dirt road in a secluded area in Orange County.

---

[4] Liang could not recall whether Lim had a cell phone or a pager, although Liang testified there was some kind of communication between Lim and Sonny while Lim was driving around. Liang testified that "Sonny told us to go somewhere else to meet up with him."

6

Lim parked Sonny's car more than 50 feet away from Eric's car. Sonny got out of Eric's car carrying a red gas tank, and poured its contents on Eric's car. Lim got out of Sonny's car, and told Liang to stay inside. Sonny took off his pants and placed them in the car. There was a loud explosion, and Eric's car was now on fire. Lim and Sonny then ran back to Sonny's car. Sonny drove the group away from the area.

In the car, Sonny said he taken off his pants because some blood dropped on them. Sonny dropped Liang off back at his home in Rosemead. Liang assumed Eric had "probably bled to death." When Liang later asked Lim and Yo why Sonny had killed Eric, they "said that they don't know. Maybe Sonny's crazy." Liang testified that he was unaware of the events leading up to the robbery involving Helen and Eric. Liang said, "I didn't know anything. I didn't even know the person."

*The Investigation*

On January 24, 2000, at about 2:44 p.m., firefighters responded to a call of a vehicle fire in the area of Laguna Canyon Road. A firefighter testified that when they arrived in a dirt lot, "the whole car was enflamed, which is kind of unique." Ordinarily, just a vehicle's engine compartment is on fire. After putting out the fire, the firefighters opened the trunk and discovered a burned body lying on its side.

A crime scene investigator observed that the vehicle's license plates had been removed from the car, which was almost completely charred. The key was still in the ignition. Inside of the car there were two red plastic gas cans, several petroleum soaked towels, and a torn shirt that had some blood stains on it. Eric's wallet was found in a plastic bag. Some textbooks were found in the backseat, as well as a disposable lighter. In the trunk,

7

Eric's body "was laying on his right side, facing towards the front of the vehicle. One arm . . . , the left arm, was hanging over his head. And the other one was reaching up and grasping some wires that were underneath the back dash. The body was badly burned. And there was duct tape around the head, around the eyes."

A forensic scientist examined evidence related to Eric's homicide at the crime scene, and later at the crime lab. She noted that duct tape was "wrapped around [Eric's] eye area. Also, a piece around his neck. And there were remnants of duct tape around both of his wrists." The scientist examined polyester material from Eric's lung, which was consistent the material from Eric's shirt. The scientist also analyzed DNA evidence from the carpeting in Helen's house, as well as other blood stains in the home. The collected DNA evidence was consistent with Eric's DNA.

A forensic pathologist conducted an autopsy of Eric's body. The body had experienced considerable charring, and "there was a silvery duct tape that covered the eyes and also the neck." The pathologist observed that the trachea, or windpipe, was bright red, which meant that "there's been some sort of rough abrading material that was in contact with the surface at one time." This would have occurred "immediately before death." The pathologist noted the skin had been burned away in many parts of the body, which may have obscured any external injuries. The pathologist opined that if Eric had experienced a knife wound to his forehead, it was likely that this would have caused profuse bleeding, but it likely would not have been life threatening given Eric's age (20). Due to the absence of soot in Eric's mouth and air passages, the pathologist opined that Eric was not breathing at the time of the fire. However, there was no way of telling how much time passed between Eric's death and the fire.

When asked about the cause of Eric's death, the pathologist opined that given "the rapidity of death, it suggests to me that he died of asphyxiation, a mechanical obstruction of the airway of some kind, prior to death." The pathologist "noted that the duct tape was not over the nose and the mouth. It was around the neck. So one possibility, of course, is that there was constriction about the neck caused by the duct tape. A kind of strangulation that is a mechanical asphyxiation. [¶] Another possibility is, due to the fact of the reddening that I found in the upper airway, that something had been thrust into the mouth and had prevented air exchange through the mouth."

On February 24, 2000, Irvine Police Department investigators interviewed Lim. Lim said that Sonny had bought him a cell phone about a year earlier. Lim admitted that Sonny had called him about two or three in the morning. When the police asked if Sonny had told him about the problems Helen had with Eric, he said, "I don't remember what the problems are he had. All he told me is that, all he told me is that she didn't like him." Lim admitted he had been outside at Helen's house once, for about a half an hour smoking. Lim said that he saw a red plastic gas can in Sonny's car. Lim largely answered, "I don't know" to most of the questions asked of him.

*Court Proceedings*

In May 2001, the People filed an information charging Helen, Sonny, Yo, Lim, and Liang with murder. The People alleged two special circumstances: lying in wait, and a murder committed during a robbery. The People also alleged a gang enhancement. The court granted a severance motion as to all five defendants.

In January 2002, Lim's jury trial began. The jurors were unable

9

to come to a unanimous decision and the court declared a mistrial. On the verge of a retrial, Lim pleaded guilty to murder, and the People dismissed the enhancements. The court imposed a negotiated sentence of 25 years to life.

In September 2021, Lim filed a petition to vacate his conviction and to be resentenced. (§ 1172.6.) The trial court issued an order to show cause and scheduled an evidentiary hearing.

In October 2023, the trial court conducted the hearing. After considering the 2002 trial transcripts, the court denied the petition (we will quote extensively from the trial court's analysis in the discussion section of this opinion).[5]

## II.

## DISCUSSION

Lim contends there is insufficient evidence to support his murder conviction under current law. We disagree. We find that there is substantial evidence in the record to support the trial court's factual determination that Lim was a major participant in the underlying felony and that he acted with reckless disregard for human life. Given our finding, we need not address Lim's alternative claim that there is not substantial evidence to support a theory that he was a direct aider and abettor of Eric's murder.

In this discussion we will: A) consider the substantial evidence standard of review; B) discuss the elements of the revised felony-murder rule; and C) analyze the elements of the rule as applied to the facts.

---

[5] We commend the trial court on the thoroughness of its ruling.

10

*A. Standard of Review*

"The scope of our review for substantial evidence is well settled. The test is not whether the People met their burden of proving beyond a reasonable doubt that [a defendant] was ineligible for resentencing, but rather 'whether *any* rational trier of fact could have' made the same determination, namely that '[t]he record . . . disclose[s] . . . evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find'" defendant guilty beyond a reasonable doubt. (*People v. Williams* (2020) 57 Cal.App.5th 652, 663.)

In a substantial evidence review we consider the evidence in the light most favorable to the trial court's ruling. (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.) "In deciding the sufficiency of the evidence, a reviewing court resolves neither credibility issues nor evidentiary conflicts. [Citation.] Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact." (*People v. Young* (2005) 34 Cal.4th 1149, 1181.)

"'When a trial court's factual determination is attacked on the ground that there is no substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether, *on the entire record,* there is substantial evidence, contradicted or uncontradicted, which will support the determination . . . .'" (*People v. Superior Court (Jones)* (1998) 18 Cal.4th 667, 681.) "'"Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence."'" (*People v. Navarro* (2021) 12 Cal.5th 285, 339.)

*B. The Current Felony-Murder Rule*

Effective January 1, 2019, through Senate Bill No. 1437 (2017–2018 Reg. Sess.), the Legislature amended "'the felony murder rule and the

11

natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.'" (*People v. Gentile* (2020) 10 Cal.5th 830, 846–847, superseded by statute on other grounds as stated in *People v. Oyler* (2025) 17 Cal.5th 756; see Stats. 2018, ch. 1015, § 1, subd. (f).)

Section 188, subdivision (a)(3), now provides, "*Except as stated in subdivision (e) of Section 189*, in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime." (Italics added.)

Section 189, subdivision (e), states the only exception to the malice requirement—the current felony-murder rule—which is presently limited to circumstances where the defendant "was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2."[6] (§ 189, subd. (e)(3).)

Ordinarily, the Eighth Amendment requires a defendant to have an intent to kill in order for the death penalty to apply. (*Enmund v. Florida* (1982) 458 U.S. 782, 797.) However, the United States Supreme Court has held that "major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the *Enmund* culpability requirement." (*Tison v. Arizona* (1987) 481 U.S. 137, 158.)

---

[6] Section 190.2, subdivision (d), generally provides that "every person, not the actual killer, who, with reckless indifference to human life and as a major participant, aids, abets, counsels, commands, induces, solicits, requests, or assists in the commission of [an enumerated] felony . . . which results in the death of some person or persons . . . shall be punished by death or imprisonment in the state prison for life without the possibility of parole."

12

In *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*), the California Supreme Court identified a nonexclusive list of factors that are relevant in deciding whether a person was a *major participant* in a felony murder. In *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*), the Court similarly identified a nonexclusive list of factors that are relevant in deciding whether a person acted *with reckless indifference to human life*. The Court has further held: "It is undisputed that when Senate Bill 1437 amended Penal Code section 189 to incorporate major participation and reckless indifference requirements, it codified the understanding of those requirements elucidated in *Banks* and *Clark*." (*People v. Strong* (2022) 13 Cal.5th 698, 710.)

The *major participant* factors identified in *Banks* "are these: What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used?" (*Banks*, *supra*, 61 Cal.4th at p. 803, fn. omitted.) The Court stated, "No one of these considerations is necessary, nor is any one of them necessarily sufficient. All may be weighed in determining the ultimate question, whether the defendant's participation 'in criminal activities known to carry a grave risk of death' [citation] was sufficiently significant to be considered 'major.'" (*Ibid.*)

The *reckless indifference to human life* factors identified in *Clark* are: the defendant's knowledge, and the use and number of weapons; the defendant's proximity to the crime and opportunity to stop the killing or aid

13

the victim; the duration of the conduct, that is, "whether a murder came at the end of a prolonged period of restraint of the victims by defendant"; the defendant's awareness his or her confederate was likely to kill; and the defendant's efforts to minimize the possibility of violence during the crime. (*Clark*, *supra*, 63 Cal.4th at pp. 618–623.)

In *In re Scoggins* (2020) 9 Cal.5th 667, 677, the California Supreme Court further explained the reckless indifference to human life inquiry: "Reckless indifference to human life has a subjective and an objective element. [Citation.] As to the subjective element, '[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed,' and he or she must consciously disregard 'the significant risk of death his or her actions create.' [Citations.] As to the objective element, "'[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation."' [Citations.] 'Awareness of no more than the foreseeable risk of death inherent in any [violent felony] is insufficient' to establish reckless indifference to human life; 'only knowingly creating a "grave risk of death"' satisfies the statutory requirement." (*Ibid*.)

"We analyze the totality of the circumstances" in a manner that largely overlaps with our "major participant" discussion. (*In re Scoggins*, *supra*, 9 Cal.5th at pp. 676–677.) "'Although we state these two requirements separately, they often overlap,'" because "'the greater the defendant's participation in the felony murder, the more likely that he [or she] acted with reckless indifference to human life.'" (*Clark*, *supra*, 63 Cal.4th at p. 615.)

14

*C. Application and Analysis*

After reviewing the record, we find: (1) there is substantial evidence to support the trial court's determination that Lim was a major participant in the robbery; (2) there is substantial evidence to support the court's determination that Lim acted with reckless indifference to human life; and (3) Lim's arguments to the contrary are not persuasive.

*1. Major Participant in the Robbery*

As far as Lim being a major participant, the trial court acknowledged in its ruling that "Helen and Sonny were the masterminds behind this plot." However, the court also agreed with the People's characterization of Lim as Sonny's "right-hand man." To support this proposition, the court noted that the cell phone evidence introduced by the People "showed that [Lim], Sonny and Helen were in nearly constant contact before, during, and after the robbery murder." The court also noted that Lim "was present at the initial dinner one week before the robbery when Sonny and Helen announced [the plan] to rob a rich man they knew."

The trial court further acknowledged that "there is no evidence that [Lim] supplied the knife or otherwise used a deadly weapon," however, the court went on to note that Lim "hid in the house and waited to ambush the victim when he arrived." The court observed that Lim had "participated in duct taping the victim so that the victim was immobilized." Moreover, Lim "directly helped Sonny by carrying the victim downstairs" and Lim "drove Sonny's car while Sonny drove the victim's car." The court further noted that Lim "communicated Sonny's instructions throughout the day thereby acting as a liaison between Sonny and the rest of the group." And importantly, the court remarked that Lim was "the only other person present when Sonny lit

15

the victim's car on fire."

The trial court summarized its factual determination that Lim was a major participant in the robbery as follows:

"The evidence establishes that petitioner was more than just a passive bystander. [Lim] actively participated in all aspects of this crime and was certainly in one of the best positions to prevent the murder. [Lim] had ample opportunity to deescalate the situation or intervene to aid the victim, but failed to do so. For example, after Sonny Wong cut the victim's forehead with a knife and the victim began bleeding profusely, [Lim] could have urged Sonny to abort the plan and let the victim go so that the victim could get help. Instead, [Lim] helped Sonny carry the bleeding victim downstairs and helped Sonny load the victim into the trunk of the car. Even when Sonny left the house, [Lim] did not untie the victim, check on his well-being or call for help. [Lim] could have used the time to free the victim and flee the scene, but he failed to do so. Instead, [Lim] looked for the victim's cell phone to make sure that the victim would not be able to call for help.

"Finally, [Lim] drove Sonny's car while Sonny drove the victim's car, showing a clearly coordinated effort between the two men based on this implicit agreement that [Lim] would drive Sonny's car so Sonny could dispose of the victim. This supports a finding that [Lim] was a major participant.

"Once separated from Sonny, [Lim] could have driven to a police station, called for help or even just gone home. Instead, he waited for further instruction from Sonny and met Sonny at the empty construction site . . . . . [Lim] parked far away from where Sonny parked the victim's car suggesting that he knew they were about to light the victim's car on fire. Again, [Lim] played an active role in the offense [by] exiting the car and instructing the others to wait. [Lim] stood next to Sonny as Sonny poured gasoline on the

16

victim's car while the victim remained trapped inside. [Lim] and Sonny ran together back to Sonny's car to escape as a group. Nothing about [Lim's] actions suggest that he was a minor or inadvertent player in this offense."

In short, we agree with the trial court's summary of the relevant evidence, and the reasonable inferences to be drawn from that evidence. (See *People v. Navarro, supra,* 12 Cal.5th at p. 339 [""Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence""].) In particular, and as noted by the trial court, Lim was involved for a considerable period of time and "in a position to facilitate or prevent the actual murder." (See *Banks, supra,* 61 Cal.4th at p. 803.) Based on the totality of the evidence, and the factors identified in *Banks*, we find substantial evidence to support the court's factual determination that Lim was a major participant in the underlying robbery of Eric.

### 2. Reckless Indifference to Human Life

"Where a victim is held at gunpoint, kidnapped, or otherwise restrained in the presence of perpetrators for prolonged periods, 'there is a greater window of opportunity for violence' [citation], possibly culminating in murder." (*Clark, supra,* 63 Cal.4th at p. 620.)

In this case, the trial court quoted the above passage from *Clark*, and noted that Lim "kept the victim restrained while Sonny left the house to try to extract money from the victim's bank account. When Sonny returned and berated the victim, the risk for violence increased. Again, [Lim] did nothing. [Lim] helped Sonny carry the victim downstairs and left the victim in the trunk while Sonny and Helen left to get cleaning supplies, return, and spent 30 minutes cleaning the carpet. The victim remained restrained and suffering and still [Lim] did nothing. Ultimately, the victim spent several

17

hours bound and tied up in the house and in the trunk of the car, as" the fire was not spotted "until later that afternoon."

The trial court noted Lim's "complete lack of effort to minimize the risk of violence during the robbery is evidenced by his significant participation in both restraining the victim and disposing of the body." (*In re McDowell* (2020) 55 Cal.App.5th 999, 1014 ["defendant is more culpable when he does nothing to avoid violence despite having time to reflect and consider his options"].)

The trial court further observed that: "Under the totality of the circumstances, the evidence supports a finding that with respect to [Lim's] subjective state of mind, [Lim] understood there was a high risk that the victim would die when [Lim] put him in the trunk. There is zero indication from the available record that [Lim] expected the victim to survive once the group left Helen's house." (See *In re Scoggins, supra,* 9 Cal.5th at p. 677 ["As to the subjective element, '[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed,' and he or she must consciously disregard 'the significant risk of death his or her actions create'"].) The court stated: "From an objective standpoint, any reasonable person would know that the victim's death was a likely result." (See *Ibid.* ["As to the objective element, "'[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation"'"].)

"Under California law, there must be a logical nexus—i.e., more than mere coincidence of time and place—between the felony and the act resulting in death before the felony-murder rule may be applied to a

18

nonkiller." (*People v. Cavitt* (2004) 33 Cal.4th 187, 196.) The trial court summarized the nexus between the robbery and the act resulting in Eric's death, and concluded its factual findings as follows:

"Helen's tutor was the intended target of the robbery. As part of that felony, [Lim] and the others bound and duct taped the victim . . . . [Lim] and Sonny left the victim bound and duct taped in the trunk of a car for an extended period of time. [That the] victim ultimately died of asphyxiation outside of Lim's presence does not negate the logical nexus between the robbery and the killing. [¶] The court would note . . . it is not required that the person die immediately as long as the act causing death occurred while the defendant was committing the felony . . . . It is also . . . not required that the defendant be present when the act causing the death occurs . . . .

"[T]he only reasonable conclusion from the circumstantial evidence is that the victim was killed to eliminate the sole witness to the robbery or that he died accidentally as a result of being bound and gagged during a robbery. [The pathologist] testified at trial that the victim could have died from the duct tape surrounding his throat or having a foreign object lodged in his mouth. [Lim] need not have been the exact person to place the tape around the victim's neck to still be guilty of felony murder for the victim's death, given [Lim's] overall involvement in the case.

"The court finds that [Lim's] arguments minimizing his level of knowledge and involvement are not credible when viewing the evidence as a whole. Despite [Lim's] youth, the evidence shows that [Lim] was a key player and/or major participant in the victim's robbery and murder and acted with reckless indifference to human life. In conclusion, the evidence supports a conclusion that [Lim] is guilty of felony murder under 189(e)(3) beyond a reasonable doubt and, thus, the petition is denied."

19

Here, we note that the trial court's first factual finding that Lim was a major participant in the underlying felony is—by itself—supportive of the court's additional factual finding that Lim acted with reckless indifference to human life. (See *Clark*, *supra*, 63 Cal.4th at p. 615 ["the greater the defendant's participation in the felony murder, the more likely that he [or she] acted with reckless indifference to human life"].) And as in many criminal cases, although there is no direct evidence of Lim's mental state, the trial court properly relied on circumstantial evidence to determine whether Lim acted with reckless indifference to human life. "Circumstantial evidence does not directly prove the fact to be decided, but is evidence of another fact or group of facts from which you may logically and reasonably conclude the truth of the fact in question." (CALCRIM No. 223 ["direct and circumstantial evidence are acceptable types of evidence to prove or disprove the elements of a charge, including intent and mental state"].)

In sum, considering the totality of the evidence, and the appropriate factors to be weighed as stated in *Banks* and *Clark*, we find there is substantial evidence in the record to support the trial court's factual determination that Lim was both a major participant in the underlying felony (robbery) and he acted with reckless indifference to Eric's life.

### 3. Analysis of Lim's Arguments on Appeal

Lim argues that "substantial evidence does not support a finding the killing occurred during the perpetration of the robbery." Lim claims that by the time he "reached the donut shop, he reached a place of temporary safety." And he also claims that "the robbery and the murder were not part of one continuous transaction." We disagree.

To address Lim's claims in this regard, "we first recognize that

20

we are presented with two related, but distinct, doctrines: the continuous-transaction doctrine and the escape rule. The 'escape rule' defines the duration of the underlying felony, . . . by deeming the felony to continue until the felon has reached a place of temporary safety. [Citation.] The continuous-transaction doctrine, on the other hand, defines the duration of *felony-murder* liability, which may extend beyond the termination of the felony itself, provided that the felony and the act resulting in death constitute one continuous transaction." (*People v. Cavitt, supra,* 33 Cal.4th at p. 208.)

"The killing is considered to be committed in the perpetration of the underlying felony if the acts were part of a continuous transaction. [Citation.] No strict causal or temporal relationship between the murder and underlying felony is required." (*People v. Booker* (2011) 51 Cal.4th 141, 175.) The California Supreme Court has "reiterated that determining whether a killing occurred during the commission of a felony enumerated under Penal Code section 189 is not ""a matter of semantics or simple chronology." Instead, 'the focus is on the relationship between the underlying felony and the killing."' (*People v. Jones* (2001) 25 Cal.4th 98, 109.)

"We long ago rejected the assumption 'that to bring a homicide within the terms of section 189 of the Penal Code, the killing must have occurred "while committing," "while engaged in," or "in pursuance" of the named felonies, and that the killing must have been "a part of" the felony or attempted felony "in an actual and material sense."' [Citation.] Thus, a murder may be determined to have been committed in the perpetration of a felony *if it occurred after the felony*, e.g., during the attempt to escape or for the purpose of preventing discovery of the previously committed felony." (*People v. Jones, supra,* 25 Cal.4th at pp. 108–109, italics added.)

Here, Lim's arguments conflate the escape rule and the

continuous transaction doctrine. That is, even if we accept Lim's premise that he reached a point of temporary safety when he got to the donut shop, he continued to aid and abet Sonny by returning to Helen's house as he was instructed, and then by following Sonny to Orange County. It is a reasonable inference that Lim did this in order to facilitate the disposal of both Eric's body and car, and "for the purpose of preventing discovery of the previously committed felony." (See *People v. Jones*, *supra*, 25 Cal.4th at pp. 108–109.)

In sum, for purposes of felony murder liability, the robbery at Helen's home, Eric's murder, and the destruction of evidence of the robbery in Orange County were all part of one continuous transaction in which Lim was a major participant who acted with reckless disregard for human life.

Lim also makes numerous factual arguments on appeal. For instance, Lim claims that he "played no role in the planning of the robbery or any criminal enterprise that led to Eric's death." We disagree.

Lim's argument on this point is inferentially contradicted by the evidence of the phone calls between Sonny, Helen, and Lim prior to the robbery, as pointed out by the trial court. More importantly, Lim's various arguments about the evidence, and the inferences he draws from that evidence (that are contrary to the inferences that were drawn by the trial court), appear to misapprehend our role in a substantial evidence review.

Again, our role in a substantial evidence review is not to reweigh the evidence*,* nor to second guess the factual determinations of the trial court. (See *People v. Swanson* (1962) 204 Cal.App.2d 169, 173.) In a substantial evidence review, "'we review the evidence in the light most favorable to the prosecution and presume in support of the [order] the existence of every fact the [superior court] *could reasonably have deduced* from the evidence.'" (*Williams*, *supra*, 57 Cal.App.5th at p. 663, italics added.)

22

Once again, we reiterate that there is substantial evidence in the record to support *the trial court's reasonable inferences*, and ultimately its factual determination that Lim was a major participant in the robbery of Eric, and that Lim also acted with reckless indifference to Eric's life.

Lim also argues that the Supreme Court's recent holding in *People v. Emanuel* (2025) 17 Cal.5th 867 (*Emanuel*), concerning the application of the felony-murder rule, compels a different result. We disagree.

In *Emanuel*, murder victim Sonenberg had arranged to sell a pound of marijuana to defendant Emanuel, and his codefendant Whitley. (*Emanuel*, *supra*, 17 Cal.5th, at p. 875.) Sonenberg arranged to meet Emanuel near a San Jose park, in the middle of the afternoon, in order to complete the deal. (*Id*. at p. 875) Based on the available evidence, it appears that Sonenberg was inside of his truck, with the ignition on, when Whitley and Emanuel approached the truck on a residential street. Whitley pulled a handgun on Sonenberg, hit him with the gun, pointed it at Sonenberg's leg, and demanded the marijuana. Sonenberg refused to give up the marijuana, so Emanuel said "'let's go'" and started to leave. (*Id*. at p. 891.) Sonenberg then tried to push Whitley's handgun away from him. Whitley's handgun then fired once, striking Sonenberg in the neck. (*Id*. at pp. 895–896.) Sonenberg's truck then lurched backward with enough force to throw him out of the passenger door. (*Id*. at p. 877.) First responders arrived at the scene. Sonenberg was found lying against a curb; however, he "died at the scene from a 'close-range' gunshot wound to the right side of his neck that perforated his carotid artery." (*Ibid*.)

In 2015, a jury found Emanuel guilty of first degree felony murder. (*Emanuel*, *supra*, 17 Cal.5th, at p. 879.) At that time, a defendant could be found liable for murder if he "committed or attempted to commit an

inherently dangerous felony, such as robbery, and an accomplice killed someone during the commission of the felony." (*Id.* at p. 876.) In 2018, following the passage of Senate Bill No. 1437, Emanuel filed a petition for resentencing. (*Id.* at pp. 879–880.) The trial court issued an order to show cause, and after an evidentiary hearing in which the court reviewed the 2015 trial transcripts, the court denied the petition. The court determined "that Emanuel was a major participant in the robbery who acted with reckless indifference to human life." (*Id.* at p. 881.) After analyzing the "reckless indifference" factors, the California Supreme Court disagreed with the ruling of the trial court and remanded for resentencing. (*Ibid.*)

In this case, we find that the facts concerning Lim are largely distinguishable as applied to each of the factors as analyzed in *Emanuel* by the Supreme Court. (*Emanuel*, *supra*, 17 Cal.5th, at pp. 885–896.)

**a. Use of or Awareness of the Presence of Weapons and Knowledge of Cohorts Likelihood of Killing**

In *Emanuel*, the California Supreme Court noted that "Emanuel did not use a gun or other weapon during the robbery. The only gun was used by Whitley. The trial court expressly found 'there was no evidence in the record demonstrating that, prior to the robbery, Emanuel knew Whitley possessed a gun, would bring that gun to the robbery, or "was likely to use lethal force."'" (*Emanuel, supra*, 17 Cal.5th, at p. 885.) Based on this, the Supreme Court concluded that this factor did "not weigh in favor of a finding of reckless indifference." (*Ibid.*)

In this case, similar to *Emanuel*, there is no evidence that Lim himself used a weapon during the robbery. However, there is a reasonable inference that Lim became aware of the presence of knives prior to Eric

24

entering Helen's home for the planned robbery (as did Liang). Although a knife was not the instrumentality that caused Eric's death, there is a reasonable inference Lim was aware that Sonny was likely to use lethal force, in part, based on the presence of the knives. In sum, this factor weighs in favor of a finding of Lim's reckless indifference to human life.

### b. Duration of the Crime

In *Emanuel*, the Court noted "that the duration of the contact between Sonenberg, Whitley and Emanuel was 'likely not more than 12 minutes,' and the duration of the violent contact between Sonenberg and Whitley was 'presumably even less than that." (*Emanuel*, *supra*, 17 Cal.5th, at p. 886.) "[T]he available evidence, including forensic evidence, reflects that Whitley shot Sonenberg during a brief struggle. There *was no prolonged period of restraint*, and the interaction appears to have been nonviolent until Sonenberg refused to relinquish the marijuana without payment. It was at that point that Emanuel said to Whitley, 'let's go.'" (*Ibid*.) The Court therefore concluded: "The *Clark* factor concerning duration of the crime therefore is neutral in this case; it did nothing to heighten the risk of violence beyond that inherent in the robbery itself." (*Ibid*.)

Here, unlike *Emanuel*, the robbery began at Helen's home in the morning, and as the trial court noted, Eric then "spent several hours bound and tied up in the house and in the trunk of the car, as" the fire was not spotted "until later that afternoon."

In *Clark*, the Supreme Court explained that "[w]here a victim is held at gunpoint, kidnapped, or otherwise restrained in the presence of perpetrators for prolonged periods, 'there is a greater window of opportunity for violence' [citation], possibly culminating in murder." (*Clark, supra*, 63

25

Cal.4th at p. 620.) The evidence in this case regarding the length of Eric's restraint in the presence of the perpetrators (Helen, Sonny, Yo, Liang, and Lim), align with the Court's explanation in *Clark*. That is, given the duration of the Eric's robbery, there was a greater window of opportunity for violence, culminating in Eric's murder. In sum, this factor strongly weighs in favor of a finding of Lim's reckless indifference.

### c. Efforts Taken to Minimize the Risk of Violence

In *Emanuel*, the Court noted that this factor concerns facts "relevant to the minimization of risk during the planning stage" of the underlying felony. (*Emanuel*, *supra*, 17 Cal.5th, at pp. 887–888.) The Court concluded that the robbery in *Emanuel* occurred under circumstances that had the potential *for minimizing violence*. "Emanuel planned to participate in a robbery in a public location during daylight hours. The crime occurred in the open where witnesses might be present to observe from the park, passing vehicles, or nearby residences. This factor therefore does not support a finding of reckless indifference." (*Id*. at p. 887.)

Here, the circumstances of Eric's robbery had the potential *for maximizing violence*. These circumstances included: the robbery of Eric started in Helen's home while her parents were away, thereby increasing the likelihood that Eric could be harmed; there were knives present before Eric entered the home, which Sonny stated that he planned to use if needed; and finally, there was a plan to bind Eric with duct tape, including placing tape over his mouth, which further increased the risk that Eric might die from lack of oxygen. Contrasted with *Emanuel*, we find this factor weighs in favor of a finding of reckless indifference.

26

### d. Physical Presence at the Scene and Opportunity to Restrain Confederates or Aid Victims

In *Emanuel*, the Court noted that during the robbery, "Emanuel attempted to act as a restraining influence. In fact, the trial court appears to have accepted that he . . . advocated that he and Whitley leave. [Citation.] In addition to saying 'let's go,' Emanuel began walking away from the robbery. This provides crucial insight into Emanuel's state of mind. When met with resistance, Emanuel abandoned the plan rather than resort to greater violence." (*Emanuel*, *supra*, 17 Cal.5th, at p. 891.)

"We do not suggest that a rapidly unfolding crime may never allow for a finding of reckless indifference to human life. But where a crime unfolds quickly, this factor — the failure to restrain a cohort — cannot be said to weigh in favor of a finding of reckless indifference without some evidence in the record indicating that the defendant had a meaningful opportunity to do so." (*Emanuel*, *supra*, 17 Cal.5th, at p. 892.)

Unlike *Emanuel*, the crime in this case was not rapidly involving, in fact, it took place over a period of several hours. Lim was present during the entire encounter, and certainly had numerous meaningful opportunities to either restrain Sonny, or to aid Eric. Indeed, Sonny was away from Helen's home for extended periods of time on two occasions: to attempt to get money from Eric's accounts, and when Sonny left with Helen to get the carpet cleaning machine. As the trial court found, Eric "remained restrained and suffering and still [Lim] did nothing." Again, unlike *Emanuel*, we find this factor also strongly supports a finding that Lim acted with reckless indifference to human life.

### e. Totality of the Circumstances

"In sum, the evidence shows Emanuel set out to commit a robbery in a public place in the middle of the afternoon. He was not armed, and the trial court found he did not know Whitley was armed or likely to use lethal force. Accordingly, there was nothing in the plan that 'elevated the risk to human life beyond those risks inherent in any armed robbery,' much less a planned unarmed robbery. [Citation.] The crime unfolded without a prolonged period of restraint. When met with unexpected resistance, Emanuel told Whitley, 'let's go,' and began to walk away. This tends to show that Emanuel was unwilling to engage in further violence to accomplish the aims of the robbery. Whitley, on the other hand, pulled out a gun, hit Sonenberg with it, and fatally shot him in the neck." (*Emanuel, supra,* 17 Cal.5th, at pp. 895–896.)

Here, the evidence showed that Lim set out to commit a planned robbery in a confined location (Helen's home). Based on his communications with Helen and Sonny prior to the robbery, there is a reasonable inference that Lim also participated in the planning of the crime. Lim was not armed, but he likely knew that Sonny was prepared to use lethal force based on the knives that were at the ready at Helen's home. Further, based on the planned use of duct tape to restrain Eric, there were aspects of "the plan that 'elevated the risk to human life beyond those risks inherent in any' armed robbery.'" (Compare *Emanuel, supra,* 17 Cal.5th, at pp. 895–896.) And unlike the robbery of Sonenberg in *Emanuel,* the robbery of Eric unfolded with "a prolonged period of restraint." (*Ibid.*) Indeed, Lim directly assisted in all aspects of the crime, including binding Eric with duct tape, carrying him downstairs, and putting him in the trunk of his own car. Moreover, Lim did nothing over a period of hours either to restrain Sonny, or to aid Eric.

28

To reiterate and conclude, based on the totality of the circumstances, we find there is substantial evidence to support the trial court's factual determination that Lim was a major participant in the underlying felony and that he acted with reckless indifference to human life.

## III.

## DISPOSITION

The trial court's order denying Lim's section 1172.6 petition is affirmed.

MOORE, ACTING P. J.

WE CONCUR:

GOODING, J.

SCOTT, J.

29